# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SEAN P. DOUGHERTY,           )
                                 )
        Plaintiff,           )
                                 )
      vs.                  )         Case No. 4:21-cv-01163-MTS
                                 )
LEIDOS,                    )
                                 )
        Defendant.     )

## <u>MEMORADNUM AND ORDER</u>

Plaintiff Sean P. Dougherty filed a pro se Complaint against his former employer, Defendant Leidos, Inc., asserting sex and disability discrimination in violation of federal antidiscrimination laws. *See* Doc. [1]. Now before the Court is Defendant's Motion for Summary Judgment, under Federal Rule of Civil Procedure 56, in which Defendant seeks judgment in its favor on all of Plaintiff's claims. Doc. [70]. After a careful review of the briefing and of the record, and after drawing reasonable inferences in the light most favorable to Plaintiff, the Court concludes, for the reasons explained herein, that Defendant has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. The Court therefore will grant Defendant's Motion and enter judgment in its favor.

## I.        Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires federal district courts to grant a party's motion for summary judgment if the party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, the main purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims or defenses," with due

regard being given to the rights of those opposing a claim or defense to demonstrate in the manner provided by Rule 56, prior to trial, that a claim or defense has no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *accord Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Afterall, if a nonmoving party cannot assemble sufficient evidence to make out its claim, a trial would be pointless. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Celotex*, 477 U.S. at 331 (Brennan, J., dissenting); Charles E. Clark, *The Summary Judgment*, 36 Minn. L. Rev. 567, 578 (1952) (explaining that a trial should not be "forced upon a litigant by one with no case at all"). While employment discrimination cases often are fact intensive, there is no exception to the application of summary judgment or the summary judgment standard in discrimination cases. *Lovelace v. Washington Univ. Sch. of Med.*, 931 F.3d 698, 705 (8th Cir. 2019) ("There is no discrimination-case exception to a district court's power to grant summary judgment."); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (describing summary judgment as "a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial").

On a motion for summary judgment, the movant—here, Defendant—bears the initial responsibility of informing the district court of the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact. *Torgerson*, 643 F.3d at 1042; *Bedford*, 880 F.3d at 996. Since the burden of persuasion at trial in this case would be on Plaintiff—the non-moving party here—Defendant may satisfy Rule 56's burden of production in one of two ways. Defendant may either produce evidence negating an essential element of Plaintiff's case, or it may show that Plaintiff does not have enough evidence of an essential element of his claims to carry his ultimate burden of persuasion at trial. *Bedford*, 880 F.3d at 996; *accord* Fed. R. Civ. P. 56(c)(1). Put differently, if Plaintiff must prove

- 2 -

*X* to prevail, then Defendant, here at the summary judgment stage, can either produce evidence that *X* is not so or Defendant may point out that Plaintiff lacks evidence to prove *X*.  *Bedford*, 880 F.3d at 996; *see also Celotex*, 477 U.S. at 325 (making clear that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case").

The "initial burden on the movant is 'far from stringent' and 'regularly discharged with ease.'"  *Bedford*, 880 F.3d at 996 (quoting *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001)).  Once Defendant has satisfied it, Plaintiff "must respond by submitting evidentiary materials" of specific facts showing the presence of a genuine issue for trial. *Bedford*, 880 F.3d at 996 (quoting *Torgerson*, 643 F.3d at 1042).  Plaintiff's response must do more than raise some abstract doubt about the material facts, *id.*, and he cannot rest on mere denials or allegations, *Gibson v. American Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012). Plaintiff must instead present enough evidence that a jury could reasonably find in his favor.  *Id.*; *Bedford*, 880 F.3d at 996.

Accordingly, the Court must examine whether Defendant has satisfied its initial burden and, if so, whether Plaintiff sufficiently responded.  In doing so, the Court will view the evidence and draw reasonable inferences in the light most favorable to Plaintiff, since he is the nonmoving party here.  *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023) ("Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."); *Scott v. Harris*, 550 U.S. 372, 378 (2007) (explaining that when the parties' version of events differ, "courts are required to view the facts and draw

reasonable inferences in the light most favorable to the party opposing the summary judgment motion" (internal quotations and alterations omitted)).

## II.      Background

Defendant is a scientific engineering and technology applications company that works in the areas of national security and critical infrastructure, among others.  In February 2020, Plaintiff began working for Defendant as a Network Support Specialist within the Defense Information Systems Agency ("DISA") building at Scott Air Force Base.  Network Support Specialists support the contract Defendant has with DISA.  Plaintiff's position was not a cybersecurity one, and prior to his acceptance of the position, Plaintiff was informed of that fact. A recruiter with Defendant told Plaintiff that he could apply and interview for a cybersecurity position with Defendant after he received his Security Plus certification.  The recruiter, however, never promised Plaintiff any cybersecurity position; the recruiter told Plaintiff only that he could apply and interview for cybersecurity roles for which he was qualified.  Defendant, though, has a policy that requires employees to have a minimum of twelve months of good standing in their current role before an intercompany placement or transfer.  As Plaintiff acknowledges, when employees move roles shortly after starting them, it is "difficult" for both Defendant and for its customers because Defendant must fill the position of the transferring employee who would have taken considerable time to hire and train for the position they then are departing.  Doc. [83] ¶ 6.

A.  Applications for Other Positions

By March 2020, the month after Plaintiff started working at Defendant, he already had applied for several other positions with Defendant.[1]  After receiving multiple applications from Plaintiff, Defendant's recruiter reminded Plaintiff that Defendant's policy said employees should

_____

[1] Plaintiff applied for thirteen other positions with Defendant in the first six months after accepting his employment.

- 4 -

stay in their position for twelve months before seeking transfer.  Undeterred, Plaintiff said that his current position was not a good fit for him.  For that reason, in April 2020, Plaintiff's then-supervisor assisted Plaintiff in finding a different role on Defendant's DISA contract.  The parties dispute whether his then-supervisor explained to Plaintiff that the move would be an exception to the twelve-month rule.  In his new position, Plaintiff worked as a Network Controller and reported to Janice Richardson.  At this same time, Plaintiff also returned to working in the DISA building, after working from home for a stretch in his prior position due to the coronavirus pandemic.  No one in the Network Controller position that reported to Richardson worked from home during the time of Plaintiff's employment.

### B.  Extended Time Off

While Plaintiff worked as a Network Controller, Defendant allowed Plaintiff to take time off work to complete a course of training for the Security Plus certification exam and to take the exam itself.[2]  Plaintiff's supervisor informed him that he could use up to forty hours of unaccrued paid time off to prepare for and take the exam.  Doc. [87-1] at 38.  Plaintiff completed the Security Plus bootcamp on Monday, June 29, 2020, and was scheduled to take the exam on Tuesday, July 7, 2020.  Though he would ostensibly complete the test on a Tuesday, he informed his supervisor that since he had "so much going on" it "would be best for [him] to take the whole week [of July 6] off."  *Id.* at 41.

On July 6, when Plaintiff's supervisor inquired about the test scheduled for the next day, Plaintiff informed her that he "had to reschedule" the exam due to "a ridiculous amount of personal stress."  *Id.* at 43.  Despite not taking the test that week, he took the entire week off work.  Saturday, July 11, was the new scheduled test day.  It turned out, though, that the

---

[2] Plaintiff did not need a Security Plus certification in order to perform the CVN work to which he was assigned. Doc. [83] ¶ 79.

disability service department of the test administrator, which Plaintiff needed, was not available on the weekend.  Plaintiff rescheduled again, this time for Tuesday, July 14.  After Plaintiff told his supervisor of the latest rescheduling of the test, Plaintiff's supervisor said she would see him on Wednesday, July 15.  *Id.* at 46.  Plaintiff finally took the test on July 14.  Afterwards, he told his supervisor he would be back to work on Friday, July 17 (*not* Wednesday, July 15).  Alas, he did not return to work until Monday, July 20.  Doc. [83] ¶ 22.  Altogether, Plaintiff submitted over fifty-five hours of *unaccrued* paid time off, more than the forty hours Defendant told him he could take.

### C.  COVID-19 Quarrel

The following month, in August 2020, Plaintiff ran afoul of Defendant's COVID-19 pandemic requirements.  At the time, DISA required everyone working in its building to certify they were not experiencing any COVID-19 symptoms before entering each day, and it also required all persons in the building to wear masks at all times unless they were eating or drinking or unless they were at a workstation positioned at least six feet from others.  On August 12, Lindsey Liefer, a supervisor, saw Plaintiff speaking with another employee while unmasked.  Liefer told Plaintiff to put on his mask, and then she walked away.  Instead of putting on his mask as requested and required, Plaintiff summoned Liefer over to him and asked her if he "look[ed] like a dog to [her]."  Doc. [83] ¶ 30.  Liefer again instructed Plaintiff to put on his mask and he then did so.[3]  The very next day, on August 13, Plaintiff told Richardson, his direct

---

[3] With his summary judgment opposition briefing, Plaintiff provided what he titled a declaration that seeks to recharacterize this exchange.  Doc. [87-10].  *First*, his declaration was neither made under oath nor in compliance with 28 U.S.C. § 1746.  *Second*, even assuming the declaration could be used to support other factual positions, it cannot be used on this point.  In his declaration Plaintiff wrote that he put on his mask "after the first time" Liefer asked him to put it on.  Doc. [87-10] ¶ 7.  At least on this point, the declaration is a sham.  *See Button v. Dakota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020) (explaining a sham affidavit is one that "contradicts prior testimony" or is a "sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before").  Elsewhere, Plaintiff consistently has noted that Liefer had to tell him multiple times to put on his mask before he finally complied.  For example, months before Plaintiff filed this action, he numerically delineated what

- 6 -

supervisor, via a private Facebook message, that he had "been sick for the past few days," with symptoms that included a "[s]evere" headache, a stuffy nose, and a sore throat, along with "breathing problems."  Doc. [87-1] at 74–75.  It is generally known that these are COVID-19 symptoms.

### D.  The Final Written Warning

On August 14, 2020, Richardson emailed Fred Hudson "addressing Plaintiff's numerous performance issues."  Doc. [83] ¶ 34.  Among these performance issues were that Plaintiff reported absences *after* his shift started or used Facebook Messenger to report his absences instead of proper channels; he failed to complete his timecard daily; he arrived to work late and took excessive breaks; he was dismissive when Richardson tried to discuss his late arrivals and excessive breaks; he was argumentative when provided with constructive feedback regarding his work; he spent work time looking for other jobs; and when he was reminded that company policy required him to stay in his current position for twelve months before taking a new internal position, he responded that he was unsure he could continue to work the rest of the day because his "anger was off the charts."  *Id.*

On August 31, 2020,[4] Richardson issued Plaintiff a Final Written Warning that "addressed numerous issues with his performance."[5]  *Id.* ¶ 35–36; *accord* Doc. [71-13].  The Final Written Warning cited Plaintiff's "applying for internal jobs despite repeated reminders about the Internal Mobility policy; failure to follow COVID guidelines; inappropriate

---

he called the sequence of events.  He plainly wrote that Liefer asked him to put on his mask twice before he did so.  Doc. [71-24] at 6.  Then, in his deposition, Plaintiff testified, under oath, that Leifer had to tell him "again" to put on his mask.  Doc. [71-4] at 37-38 (88:1–89:15).  Plaintiff's sham declaration does not create a genuine dispute of fact.  *Button*, 963 F.3d at 830.

[4] August 31 was the first day Plaintiff reported to work since the mask incident; he was absent from August 13 through August 30.  Doc. [83] ¶ 33.

[5] While Plaintiff at times argues that he should not have received a *final* written warning since he previously had not received a written warning, he admits that Defendant does not have a progressive discipline policy and that its management has discretion to determine the level of discipline issued.  Doc. [83] ¶ 92.  And, linguistically, something that is *final* need not have been preceded.

communication with management when he was not wearing his mask; failure to follow appropriate reporting procedures when late or absent; and utilizing company time for personal activities." *Id.*

Others also were present in the meeting at which Richardson issued Plaintiff the Final Written Warning. Besides Richardson and Plaintiff, Hudson and Paula Decaney also were present in the meeting. Plaintiff maintains that during the meeting, Decaney said she did not like men and that she wanted Plaintiff fired.[6] This meeting was the first time Plaintiff met Decaney in person. Prior to it, Plaintiff spoke with her on the phone one time. Plaintiff never saw or spoke to Decaney again after the Final Written Warning meeting.

The day after the Final Written Warning meeting, Plaintiff emailed Hudson saying that Plaintiff felt the others were targeting him and discriminating against him due to his "strong personality and desire to succeed." Doc. [83] ¶ 41. He added that he no longer felt "comfortable" working in that environment. *Id.* His email did *not* mention his sex or any disability or discrimination on those two bases. Doc. [87-21]. Plaintiff also prepared a twenty-one-page written response to his Final Written Warning that he provided to Workplace Relations. Doc. [71-24]; Doc. [83] ¶ 42. That twenty-one-page response never alleged or suggested Defendant or any of its employees discriminated against Plaintiff based on his sex or any disability. *Id.*

E.  The Facebook Group Chat

During his Final Written Warning meeting, Plaintiff decided he "had to start collecting evidence against [Richardson]," his supervisor. Doc. [87-4] at 53 (111:6–15). He started with a

---

[6] While the Court is taking this fact as true given the summary judgment standard, the Court also notes that Plaintiff's description of Decaney's comments have evolved over time. *Compare* Doc. [87-22] at 2 (Defendant originally reporting that Decaney made a comment that "*suggested* she does not like men" (emphasis added)), *and* Doc. [1-2] at 2 (Plaintiff's Complaint stating that Decaney "made derogatory comments toward me that suggested she does not like men"), *with, e.g.,* Doc. [87-4] at 51–52 (108:25–109:1).

private Facebook group chat that Richardson had informed him about, and invited him to join, in May 2020.  In the Facebook group chat, which contained both employees and nonemployees of Defendant, and both men and women, there were "off color and offensive" messages.  Doc. [87-1] at 11–12.  Direct Facebook messages between Plaintiff and Richardson show that when Richardson offered to invite Plaintiff into the group chat, she warned him the messages exchanged in the group were often "off color and offensive."  *Id.*  Unfazed, Plaintiff responded that he "[a]bsolutely" wanted to join; he wrote that he did not "get offended by anything" and was "very thick skinned."  *Id.* at 11–12.  Nevertheless, shortly after Richardson issued the Final Written Warning against Plaintiff, Plaintiff reported the existence of the group chat to Defendant. Defendant investigated Plaintiff's report.  The same day he reported it, Plaintiff was removed from the group, and after finding the group chat contained impertinent content, Defendant removed Richardson from her role.[7]

### F.  Post-Richardson Report

After Richardson's departure due to the Facebook group chat, Jeremy Sedlak assumed her role, at least on a temporary basis.  While Plaintiff "really liked" Sedlak, Plaintiff reported to Workplace Relations Manager Gail Wesline that he felt uncomfortable; he felt like his coworkers were watching him or talking about him.  Doc. [83] ¶ 56.  Plaintiff acknowledges, though, that no one ever said anything to him about Richardson's departure or the Facebook group chat. Because of his apparent discomfort, on September 01, 2020, Plaintiff requested that Hudson allow Plaintiff to work from home.  Doc. [71-23] at 2–3.  Hudson informed Plaintiff that there were no telework capabilities for Plaintiff's then-role with Defendant.  Plaintiff told Hudson that Plaintiff would not enter the DISA building until the Final Written Warning was removed from

---

[7] Richardson resigned her position in lieu of termination.  Doc. [83] ¶ 53.

his record or until Hudson and a representative from human resources would meet with Plaintiff and his unidentified attorney.  Hudson informed Plaintiff that Plaintiff could take the rest of the week off work, but that Plaintiff needed to return to his regular schedule the following Monday. Plaintiff did not come into work the rest of that week.

On September 07, 2020, Plaintiff sent an email to Human Resources saying that he believed the Final Written Warning was based on "miscommunications, assumptions, and fabrications" and that he felt he was being "targeted and discriminated against due to [his] strong personality, desire to succeed, disability, and gender."  Doc. [83] ¶ 50; *accord* Doc. [71-26].

G.  Plaintiff's Diagnoses

During his onboarding process with Defendant, Plaintiff sent an email to one of Defendant's human resources officials, Rebecca Cox, regarding accommodations.  In it, he wrote in part:

> In my initial application I did not report that I have a disability; however, when I was six years old, I was diagnosed with a learning and reading disability.  As an adult, I don't see myself as disabled because I have found ways to overcome these limitations.  I do want my managers to be informed of my disability in the event that something arises, such as needing a longer period of time to read a document. Beyond that, I don't feel that I need any further accommodations to excel in my new position.

Doc. [71-29].  Cox responded, asking Plaintiff to complete a reasonable accommodations form that she attached to her email.  Doc. [87-8].

Plaintiff completed the form.  On it, he noted his "learning disability and ADHD," but he explicitly informed Defendant that he was "not requesting accommodations for these conditions."  Doc. [71-30] at 8.  The only accommodation he requested, which was a near verbatim repeat of an example the form gave, was a "sit/stand desk" due to his "spondylolisthesis and degenerate [sic] disk disease."  *Id.*  That was the entirety of Plaintiff's requests and

diagnoses he claimed.  He made no mention of any issues with his eyes or his vision, and he explicitly disclaimed any accommodations related to his cognition.  It also is undisputed that Plaintiff provided no supporting medical documentation whatsoever.

Months later, on September 4, 2020, after he had received the final written warning, Plaintiff again completed Defendant's accommodation request form.  Plaintiff again noted his "learning disability in reading and comprehension, along with ADHD."  Doc. [87-13].  But this time, he requested:

> Additional time to study for required certifications and learn new material. Furthermore, I would like to request my managers and colleagues to have patience when providing help or direction.  Also, part of ADHD is forgetfulness, so providing helpful reminders is greatly appreciated.

*Id.*  This go-around, Plaintiff also provided documents that ostensibly sought to support his request, three doctors' notes dated January 23, 2003, September 21, 2010, and May 02, 2019. Doc. [71-33]; Doc. [71-34].  The 2003 note stated Plaintiff had ADHD and requested that he have "no time limitations" on "testing."  Doc. [71-33] at 4.  The 2010 note stated that Plaintiff had a diagnosis of ADHD and a learning disorder.  *Id.* at 3.  It noted his prognosis was "good" and made no mention of accommodations at all.  *Id.*  The 2019 note said only that Plaintiff had a "medical schedule A disability."  Doc. [71-34] at 2.  It provided no specifics and also made no mention of accommodations.  *Id.*

One of Defendant's human resources employees responded to Plaintiff that Defendant needed medical documentation within one year of Plaintiff's request and that the documentation should support "the specific accommodations being requested."  Doc. [71-32] at 1.  Plaintiff then provided a note dated October 21, 2020, that cited Plaintiff's ADHD and his "well documented history of a learning disorder."  Doc. [71-35].  It stated Plaintiff would require "accommodations/academic adjustments in a learning environment," specifically he would need

"out of class testing and double time on exams." *Id.* These four letters were the only doctors' notes Plaintiff ever submitted to Defendant regarding "his requested accommodations" during the entire tenure of his employment. Doc. [83] ¶ 75.

The only tests Defendant required Plaintiff to take were those during his orientation, well before his request for testing accommodations. *Id.* ¶ 76. He completed those tests without time constraints and without any issue. *Id.* He also took continuing education courses while employed with Defendant and completed those without time constraints and without issue as well. *Id.* In any event, Plaintiff resigned his employment on October 27, 2020, less than one week after he provided the only timely doctor's note to Defendant that discussed Plaintiff's necessary accommodations. Doc. [71-28] at 1.

Plaintiff also maintains that he asked Richardson, his supervisor, to reassign him to "a workstation where the computer monitors had greater mobility," Doc. [77] at 10, because, as he told Richardson, he did not want to be "straining [his] eyes all day," Doc. [71-6] at 4. Richardson informed him that none of the workstations "w[ould] get them closer than" how Plaintiff had them at his current desk. *Id.* at 3. She informed him that it was "totally ok" for Plaintiff to move the monitors as he needed and that the font on the screen also could be enlarged. *Id.* Plaintiff never requested a formal accommodation from Defendant regarding his monitors or anything to do with his vision.

## III.    Discussion

Plaintiff's Complaint brings suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.* He alleges that Defendant discriminated against him because of his "gender," "disability," and his status as a "whistleblower." Plaintiff indicated in

his Complaint that Defendant failed to promote him, failed to accommodate his disability, made the terms and conditions of his employment different from those of similar employees, retaliated against him, harassed him, levied "unwarranted discipline" upon him, and "constructive[ly] discharge[d]" him.  Doc. [1] at 4.

      A.  Sex Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1).  Discrimination because of sex can manifest itself in multiple ways, and, as noted, Plaintiff has put forward several ways in which he says Defendant discriminated against him because of his sex.  The Court will examine them in turn.

*i.  Harassment (Hostile Work Environment)*

Plaintiff asserts that he was subject to harassment, or a hostile work environment.  A plaintiff may establish a violation of Title VII by showing that discrimination based on the plaintiff's sex has created a hostile or abusive work environment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  "In order to establish a claim of harassment or hostile work environment, a plaintiff must show: '(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment.'" *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 634 (8th Cir. 2016) (quoting *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194–95 (8th Cir. 2006)).  Here, Plaintiff's harassment claim fails because he has not shown he was subject to unwelcome harassment.

- 13 -

Plaintiff points to two instances of "sexual harassment." *See* Doc. [77] at 5 (Plaintiff noting he "reported two events as alleged sexual harassment"). The first instance was when Paula Decaney, a fellow employee, allegedly told Plaintiff that "she did not like men" and "accused [Plaintiff] of not respecting women." *Id.* The second instance was the invitation by Richardson, Plaintiff's supervisor, to join a private Facebook group chat that contained sexual material and the inclusion in that group chat. *Id.* The Court concludes, on this record, that neither rises to the level of harassment.

"Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Kelleher*, 817 F.3d at 634 (quoting *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011)). Decaney's alleged statement may have offended Plaintiff, but the statement was far from severe. It did not physically threaten Plaintiff, and Plaintiff has not shown that it interfered with his work performance in any way. The Supreme Court has made the "recurring point" in its cases on harassment that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotations omitted). The Court of Appeals continues to echo that point. *See, e.g.*, *Kelleher*, 817 F.3d at 634. Decaney's single isolated statement to Plaintiff cannot be said to be extremely serious; it simply did not meet the demanding harassment standards under Title VII.

Regarding the Facebook group chat, the Court concludes that even *if* it amounted to harassment, the uncontroverted evidence shows it was not *unwelcomed* harassment. Plaintiff

- 14 -

accepted Richardson's invitation to join the group chat only *after* Richardson informed Plaintiff, two separate times, that the group was "off color" and "offensive sometimes." Doc. [71-4] at 14 (44:5–45:13); Doc. [71-14] at 11. Plaintiff's acceptance after the two warnings raises the question of whether the conduct was unwelcome. *See Moylan v. Maries Cnty.*, 792 F.2d 746, 749 (8th Cir. 1986) (explaining that "conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it"). Plaintiff's own words answer that question. When Richardson told Plaintiff about the group, Plaintiff informed her that he was "thick skinned" and did not "get offended by anything," Doc. [71-14] at 12. *See Moylan*, 792 F.2d at 749 (explaining that to be "unwelcome," the employee must have "regarded the conduct as undesirable or offensive"). His actions towards Richardson substantiated his own words; Plaintiff sent at least two overtly sexual references to Richardson in a private message, including a bawdy joke. Doc. [83] ¶ 19. These interactions with Richardson indisputably show he had no subjective reservations about this type of material. *See also Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 964 (8th Cir. 1993) (considering whether the plaintiff's actions "constitute[d] an invitation to engage in sexual discourse"). Furthermore, Plaintiff only reported the Facebook group chat to Defendant once Richardson issued a Final Written Warning to Plaintiff highlighting Plaintiff's various shortcomings; as Plaintiff put it, it was at that moment that he decided to "collec[t] evidence against" Richardson.[8] *Cf. Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1108–09 (8th Cir. 1998) (finding a plaintiff's reaction to harassment can be sufficient to support a jury finding that behavior was unwelcome).

---

[8] Doc. [71-4] at 53 (111:13–15) (testifying that, during the meeting regarding his final written warning, it was "at that point in time" that he "knew that I had to start collecting evidence against [Richardson]"); *accord* Doc. [77] at 3 (Plaintiff noting that "[a]fter receiving the [final written warning]," from Richardson, "[Plaintiff] reported the 'off color Facebook group to Leidos").

- 15 -

But even if the Court found the group chat or its contents were unwelcomed harassment, which it does not, Plaintiff has failed to show any causal nexus between the group chat (or its "off color" and "sexually explicit" content) and his gender.  *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003) (concluding first that "no reasonable jury could classify the alleged acts as harassment" but adding that the plaintiff also "failed to establish the requisite causal nexus between" the alleged instances and his protected group).  In cases of sexual harassment under Title VII, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'"  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (emphasis omitted) (quoting 42 U.S.C. § 2000e-2(a)(1));  *accord id.* at 82 (Thomas, J., concurring) (emphasizing "Title VII's statutory requirement that there be discrimination 'because of . . . sex'").  Plaintiff has provided no evidence or support whatsoever that even hints that he was included in the group chat or that messages within the group chat were discrimination toward him because of his sex.  And what he has provided, cuts *against* a finding that it was discrimination toward him because of his sex.

Both men and women were included in the group chat.  Doc. [71-24] at 12–19; *see also Oncale*, 523 U.S. at 80 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."); *Dowd v. United Steelworkers of Am., Loc. No. 286*, 253 F.3d 1093, 1101 (8th Cir. 2001) (considering whether employees who were not members of same protected group were "subjected to the same kind or intensity of harassment" in examining whether a causal nexus existed).  When Plaintiff finally reported the group chat to Defendant, he informed them that he "fe[lt] the content [wa]s misogynistic and degrading of women," for whom he had

- 16 -

"great respect."  Doc. [87-3] at 14.  So, while Plaintiff may well be correct that the content exchanged in the group chat was inappropriate, he has not shown that the group chat amounted to discrimination against him because of his sex.  *See Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (noting "apparently indiscriminate vandalism" does not have sufficient discriminatory character to establish a hostile work environment without proof that discrimination "motivated the conduct").

For these reasons, Plaintiff has failed to produce evidence from which a reasonable jury could find in his favor on his claim for hostile work environment.[9]  *See Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194 (8th Cir. 2006) ("A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000))).

### ii.   Plaintiff's Other Theories of Sex Discrimination under Title VII

On Plaintiff's remaining Title VII theories, he can survive summary judgment either by (1) presenting direct evidence of discrimination, or (2) creating the requisite inference of unlawful discrimination through the *McDonnell Douglas*[10] analysis, including sufficient evidence of pretext.  *Banford v. Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 899 (8th Cir. 2022); *Towery v. Miss. Cnty. Ark. Econ. Opportunity Comm'n, Inc.*, 1 F.4th 570, 573 (8th Cir.

---

[9]  Plaintiff has not attempted to link Decaney's statement to the Facebook group, and the Court has seen nothing in the record that does.  *See Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999) ("All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus.").  There is no indication that Decaney was part of the group, participated in the group, or even was aware of the group.

[10] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

2021).   The Court concludes that Plaintiff has not pointed to any direct evidence of discrimination to avoid summary judgment on his Title VII claims.

"Direct evidence of discrimination requires 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision.'" *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)).   The only evidence to which Plaintiff points that arguably could show discriminatory animus is Decaney's statement that she did not like men. *See* Doc. [71-4] at 118 (245:12–14) (Q: "Other than Paula [Decaney], did anyone make comments about your sex?"  A: "Just Paula."); *see also id.* at 54 (112:17–23).

Plaintiff, however, has not presented any evidence that Decaney is a decision maker.[11] *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) (remarks by employee with no hiring authority were not direct evidence because record had no evidence the employee influenced the hiring decisionmaker).   Nor has he identified any link—let alone a specific link—between Decaney's remark and any adverse action that he alleges.  *See Torgerson*, 643 F.3d at 1045–46 ("A remark by a decisionmaker, in order to be direct evidence of sex discrimination, must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action.").

Without direct evidence of discrimination, Plaintiff can survive summary judgment on his Title VII claims only by creating the requisite inference of unlawful discrimination through the

---

[11] *See, e.g.*, Doc. [71-4] at 109 (226:7–11) (testifying that Decaney "ha[d] nothing to do with my job"); Doc. [71-4] at 105 (221:10–12) (Q: "Did you ever talk to Paula Decaney about a promotion?" A: "No."). Doc. [71-4] at 4 (25:22–23) (testifying that he "d[id]n't really know" what Decaney's "title" was); Doc. [71-4] at 5 (26:1–6) (testifying that Decaney was *not* Plaintiff's supervisor and that he "d[id]n't know, honestly" whether Decaney was a supervisor because he had so "few encounters with her").

*McDonnell Douglas* analysis.  This analysis requires Plaintiff to present evidence that will establish a prima facie case for discrimination because of his sex.

a.   <u>Failure to Promote Plaintiff</u>

One of the ways Plaintiff alleges Defendant discriminated against him because of his sex was by Defendant's failure to promote him.  To establish a prima facie case in a failure to promote claim under Title VII, a plaintiff must show: (1) that he was a member of a protected group; (2) that he was qualified and applied for a promotion to an available position; (3) that he was rejected; and (4) that a similarly qualified employee, not part of a protected group, was promoted instead.  *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998); *see also Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011).  Upon review, the record plainly shows that Plaintiff has not made a prima facie case for failure to promote in violation of Title VII for at least two reasons.

*First*, Plaintiff has not shown he was qualified for a promotion.  Defendant's internal mobility policy states that in order to be eligible for "internal mobility, intercompany placement or transfer," an employee "[s]hould have a minimum of 12 months of good standing in their current role, unless otherwise agreed upon with current supervisor.  Exceptions need review by Group Human Resource Lead."  Doc. [83] ¶ 6.  Plaintiff received reminders of this policy.  In March 2020, after Plaintiff had applied for several other positions with Defendant, Marsha Barber contacted Plaintiff to remind him of the internal mobility policy.  Doc. [83] ¶ 8.  Plaintiff received another reminder from Barber and a human resources official reminding him, yet again, of the policy.  *Id.* ¶ 27.  Plaintiff has not shown he was qualified for any available position.

*Second*, Plaintiff has not even attempted to show that Defendant promoted a similarly qualified employee, not part of Plaintiff's protected group, and the record shows it did not occur.

- 19 -

Plaintiff applied for thirteen positions with Defendant during or after February 2020.  Of those positions, Defendant closed nine without hiring any applicants.  Of the four remaining positions that Defendant filled, Defendant hired a male candidate for all four.  Doc. [83] ¶ 81.  Plaintiff therefore is unable to make even a prima facie case of discrimination under Title VII premised on a supposed failure to promote him.

### b.  Various Other Alleged Adverse Employment Actions

To establish a prima facie case of sex discrimination, Plaintiff "must show that (1) []he was a member of the protected group; (2) []he was qualified to perform the job; (3) []he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (quoting *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008)).  Plaintiff has failed to establish a prima facie case of sex discrimination because he has failed to establish that he suffered an adverse employment action.[12]

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage."  *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014).  "Such action 'might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects' but '[m]inor changes' are not enough."  *Id.* (quoting *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)).  Plaintiff is less than clear on what, exactly, he maintains were the adverse employment actions Defendant took against him, but it appears he claims they were a failure to train him, the final written

---

[12] Since Plaintiff has failed to establish even a prima facie case of discrimination, Defendant is under no obligation to articulate a legitimate, nondiscriminatory reason for any action.  *Banford*, 43 F.4th at 899–900.  Nevertheless, the Court alternatively concludes that Defendant has articulated legitimate, nondiscriminatory reasons for the events with which Plaintiff takes issue, and Plaintiff has failed to demonstrate the legitimate, non-discriminatory reasons were pretextual.  *See Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013).

warning Defendant issued him, and what Plaintiff alleges was his constructive discharge.[13]  Doc. [77] at 7–8.

### 1. Failure to Train

Depending on the specifics, an employer's failure to train an employee can be an adverse employment action.  *Compare Mohr v. Dustrol, Inc.*, 306 F.3d 636, 646 (8th Cir. 2002), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ("The gist of [the plaintiff's] Title VII claim is that over the course of her three seasons with [her employer] she was denied the same training opportunities as male employees."), *with Griffith v. City of Des Moines*, 387 F.3d 733, 737 (8th Cir. 2004) ("An employer's denial of an employee's request for more training is not, without more, an adverse employment action.").  *See also Hill v. City of Pine Bluff*, 696 F.3d 709, 715 (8th Cir. 2012) (reasoning that plaintiff's disciplinary warning did not amount to an adverse employment action since plaintiff was *not* excluded from, among other things, "training and advancement opportunities").

Plaintiff's Complaint alleges that he was "denied training" on large aspects of his "job role."  Doc. [1-2] at 1.  Specifically, Plaintiff argues Defendant did not train him "to perform IP work."  Doc. [77] at 5.  Assuming for the purposes of this analysis that the failure to train Plaintiff under the circumstances amounted to an adverse employment action, Plaintiff has not shown the circumstances permit an inference of discrimination.  Circumstances that can permit an inference of discrimination may be made by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.  *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th

---

[13] The "failure to promote can constitute an adverse employment action."  *Charleston v. McCarthy*, 926 F.3d 982, 990 (8th Cir. 2019) (quoting *AuBuchon v. Geithner*, 743 F.3d 638, 643 (8th Cir. 2014)); *see also Charleston v. McCarthy*, 175 F. Supp. 3d 1115, 1123 (S.D. Iowa 2016).  Because the Court concluded Plaintiff has not establish his failure to promote claim, Plaintiff cannot successfully advance his failure to promote as the adverse action.

Cir. 2014) (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)).  Plaintiff has not pointed to any such evidence.  In fact, he has not disputed that Defendant trained both males and females to perform IP work.  Doc. [83] at ¶ 80.

Regardless, even if the Court were to conclude that Plaintiff made a prima facie claim of discrimination based on the amount of training he received, that does not end the inquiry.  When a Plaintiff makes a prima facie case, it creates a presumption of unlawful discrimination and shifts the burden of proof to the employer to present evidence of a legitimate, nondiscriminatory reason for its adverse employment action.  *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008).  "If the employer can articulate a nondiscriminatory reason, the burden returns to the employee to prove that the proffered reason is pretextual."  *Id.* at 831–32.  Here, Defendant has articulated a nondiscriminatory reason.

Employees working as a Network Controller, like Plaintiff, "typically begin working on commercial vendor ('CVN') tasks," which "provides employees with a foundation to build their skill set before moving to other areas of work within the department."  Doc. [83] ¶ 79.  These *other areas of work* include IP tasks.  *Id.*  "Generally, employees must demonstrate that they are able to handle tickets from the customer and coordinate testing between vendors and customers before being trained for IP."  *Id.*  Defendant does not dispute these facts.  *Id.*  When Plaintiff inquired with his supervisor in October 2020 why Plaintiff had not been trained to perform IP work, his supervisor informed him that Plaintiff "had not yet demonstrated that he had learned everything necessary from CVN" and explained also that Defendant "could not move him to IP training until someone else was trained to cover CVN."  *Id.* ¶ 80.

With these well-articulated nondiscriminatory reasons, the burden returned to Plaintiff to prove the proffered reason is pretextual.  He did not do so.  Indeed, his brief uses the word

- 22 -

*pretext* or *pretextual* only once. Doc. [77] at 6–7 ("If Leidos meets this burden, Plaintiff then must prove Leidos' proffered reason is not the true reason for the adverse employment action but is a pretext for discrimination.").   While he acknowledged his burden, he made no other reference to it and, in no way, showed that Defendant's well-articulated nondiscriminatory reasons were pretextual.  Accordingly, even if the Court were to strain to reach the conclusion that Plaintiff did make a prima facie case for employment discrimination on his failure to train theory, Defendant provided nondiscriminatory reasons that Plaintiff did not establish as pretext, and which therefore entitle Defendant to summary judgment on Plaintiff's theory of failure to train.

### 2.   *Final Written Warning*

Plaintiff has not identified any evidence that shows the final written warning was an adverse employment action, and the Court has seen nothing in the record that suggests it was. On its own, a warning typically does not amount to an adverse employment action.  *See Kirby v. Brennan*, 0:14-cv-00270-SRN, 2017 WL 1157093, at *8 (D. Minn. Mar. 27, 2017) (concluding that a letter of warning was *not* an adverse employment action and collecting cases of other courts that "uniformly" agree); *see also, e.g.*, *Hill v. DeJoy*, 4:19-cv-01315-RLW, 2021 WL 4476695, at *18 (E.D. Mo. Sept. 30, 2021) (finding nothing in the record suggested the plaintiff suffered an adverse employment action from a final written warning, or, "[i]n other words," the warning "did not affect her pay or terms or conditions of employment"); *Carmon v. Saks Fifth Ave., LLC*, 4:19-cv-02855-AGF, 2021 WL 1312976, at *15 (E.D. Mo. Apr. 8, 2021) (explaining it was "not clear" to the court that a final written warning or a negative performance evaluation were adverse employment actions since the actions "[we]re not alleged to have affected [plaintiff's] pay or duties, and they did not result in her termination"); *cf. Wilson v. Miller*, 821

F.3d 963, 968 (8th Cir. 2016) ("Standing alone, a poor performance rating does not constitute an adverse employment action because it has no tangible effect on the employee's conditions of employment.").  Plaintiff does not even advance an argument that the final written warning affected a term or condition of his employment.  He focuses only on his contention that Defendant should not have issued the warning to him and that it contained "false accusations." Doc. [77] at 7.  But while that contention, if true, could be relevant in a different context to suggest a pretextual purpose, it offers him little by way of establishing the warning itself as an adverse employment action.[14]

### 3.  Constructive Discharge

Plaintiff raises only one other possible adverse employment action in his opposition to summary judgment, constructive discharge.  "Just like any other discharge, a constructive discharge is an adverse employment action."  *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007) (quoting *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006)).  The trouble for Plaintiff, however, is that the undisputed facts in this case do not even come close to establishing he was constructively discharge under Title VII.  *See Bell*, 60 F.4th at 1203 ("The bar to show constructive discharge is high.").  "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)); *see also id.* at 586 (Thomas, J., dissenting) ("The constructive-discharge doctrine enabled courts to provide a

---

[14] This conclusion is in accord with the text of Title VII, which makes it unlawful for a private employer or a state or local government "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his *compensation*, *terms*, *conditions*, or *privileges of employment*, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(1) (emphasis added).  It is not at all clear under which of those respects a mere warning in and of itself would fall.

remedy to those employees who voluntarily quit based on the fiction that their decision to quit was not actually voluntary."). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* at 555.

To constitute a constructive discharge, "the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable." *Id.*; *accord id.* at 495 (noting an "overwhelming compulsion to quit" is "necessary for constructive discharge"). "To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Id.* at 494. Indeed, an employee "who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Id.*

Plaintiff was not constructively discharged for at least three reasons. *First*, the conditions of employment Plaintiff identifies simply do not meet the high bar of intolerability. *See, e.g.*, *id.* at 495 (reversing judgment entered on a jury's verdict in favor of a plaintiff and finding that, even though evidence showed that the employer discriminated against the plaintiff on the basis of his race, there was insufficient evidence to establish that a reasonable person would find the working conditions intolerable); *see also id.* at 496 (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")).

*Second*, even if the Court found the conditions were intolerable, which it does not find, Plaintiff failed to point to any evidence suggesting Defendant intentionally created the

intolerable work conditions in an effort to cause Plaintiff to resign.  *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 553 (8th Cir. 2007) ("A constructive discharge claim requires the plaintiff to show the employer created the intolerable conditions intending to force the plaintiff to quit." (internal quotations omitted)).

And *third*, Plaintiff jumped to conclusions and quit without giving Defendant a reasonable chance to work out Plaintiff's issues—even though those issues plainly were not intolerable.  Defendant assigned Plaintiff to work under Len Tyler, whom Plaintiff has described as a "very kind and understanding" person.  Doc. [71-4] at 92 (190:13–14); *accord id.* (190:10–12) (Q: "Did you feel like Len Tyler was going to try to get you fired?"  A: "No.  No.").  But when Plaintiff inquired with Tyler what Plaintiff's "work role duties" would be, Tyler could not "articulate" them to Plaintiff.  Doc. [77] at 8.  Nor, Plaintiff laments, did Tyler know "where [Plaintiff] would be seated" while he worked.  *Id.*  These trivial grievances fall far short of intolerable conditions.  But even assuming these conditions were intolerable, Plaintiff had an obligation to work out the problem with Defendant and not to jump to conclusions.  It is reasonable, of course, for an employee to want to know on what projects he or she will work or where in an office he or she will sit when starting a new position.  But it is patently unreasonable to refuse to come into work because the employee does not know before starting in the new position.  No doubt Plaintiff would have found out both what his "work role duties" would be and where he would have sat if he had simply showed-up and worked for a day with Tyler.  Instead, Plaintiff rejected the position because, in his sole estimation, it was "not a reasonable solution," and he still did not feel "comfortable" with it.  *Id.*

Having failed to show a constructive discharge, Plaintiff has failed to show any adverse employment action.  He, therefore, has not established a prima facie case of discrimination.

*Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1062 (8th Cir. 2020) (explaining a plaintiff must show "[he] suffered an adverse employment action" to make a prima facie case).

### B.  Disability Discrimination

Under the Americans with Disabilities Act ("ADA"), "employers may not discriminate against employees regarded as having a disability." *Voss v. Hous. Auth. of the City of Magnolia*, 917 F.3d 618, 624 (8th Cir. 2019) (citing *Parker v. Crete Carrier Corp.*, 839 F.3d 717, 724 (8th Cir. 2016) (citing 42 U.S.C. §§ 12102(1)(C), 12112(a))).  Plaintiff's Complaint alleges that Defendant failed to accommodate his disabilities.[15]   Doc. [1-2] at 2.  The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship on the operation of the" employer's business.  *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018).   When an employer fails to make such reasonable accommodation, it discriminates against the employee.  *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1059 (8th Cir. 2016); *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (explaining that in a reasonable accommodation case, the discrimination is framed in terms of "the failure to reasonably accommodate the disabled individual's limitations," as the ADA requires).

---

[15] Even construing Plaintiff's pro se Complaint liberally, it does not allege a hostile work environment based on disability discrimination.  In Defendant's Motion for Summary Judgment, Defendant correctly pointed out that Plaintiff "has not made any specific allegations of harassment based on his disability."  Doc. [72] at 4 n.2.  In Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff does not contest that statement or point to anything in the record even suggesting harassment based on a disability, and the Court has seen none in what it has reviewed in the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  Indeed, Plaintiff acknowledged that no one who worked for Defendant ever made comments to him about any actual or perceived disability.  Doc. [83] ¶ 85.  Therefore, to the extent Plaintiff purports to bring a claim of harassment under the ADA, Defendant is entitled to summary judgment on such claim because nothing in the record establishes Plaintiff was subject to harassment based on a disability.

To succeed on his claim for failure to accommodate his disability, Plaintiff must establish that: (1) he was disabled under the ADA; (2) Defendant knew that he was disabled; (3) he requested an accommodation; (4) Defendant failed to engage in a "flexible" and "informal[ ] interactive process" with him about possible accommodations; and (5) his disability could have been reasonably accommodated had the interactive process taken place.   *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019).

In Plaintiff's Complaint he alleges he has several "medically diagnosed disabilities," being attention-deficit hyperactivity disorder, "learning and reading disabilities," bi-lateral lazy eyes, and spondylolisthesis.  Doc. [1-2] at 2; *accord* Doc. [71-4] at 96 (195:15–24) (testifying he has those four disabilities along with "PTSD" and "something called Intermittent Explosive Disorder," which he says "aren't disabilities" and have not even been "officially diagnosed"). The Court concludes that Plaintiff's claim for failure to accommodate under the ADA fails.

> i. *Attention-Deficit Hyperactivity Disorder and "Learning and Reading Disabilities"*

During his onboarding process, Plaintiff sent an email to Rebecca Cox, a human resource official with Defendant, regarding accommodations.  In it, he wrote in part:

> In my initial application I did not report that I have a disability; however, when I was six years old, I was diagnosed with a learning and reading disability.  As an adult, I don't see myself as disabled because I have found ways to overcome these limitations.  I do want my managers to be informed of my disability in the event that something arises, such as needing a longer period of time to read a document. Beyond that, I don't feel that I need any further accommodations to excel in my new position.

Doc. [71-29].  Cox asked Plaintiff to complete a standard reasonable accommodations form that she attached to her email, and he did so.  Doc. [87-8].  On the form, Plaintiff noted his "learning disability and ADHD," but he explicitly informed Defendant that he was "not requesting accommodations for these conditions."  Doc. [71-30] at 7.

- 28 -

Months later, on September 04, 2020, after he had received his final written warning, Plaintiff submitted a new reasonable accommodations form.  On this second form, Plaintiff again noted his "learning disability in reading and comprehension, along with ADHD."  Doc. [87-13].  But this time, he requested:

> Additional time to study for required certifications and learn new material.  Furthermore, I would like to request my managers and colleagues to have patience when providing help or direction.  Also, part of ADHD is forgetfulness, so providing helpful reminders is greatly appreciated.

*Id.*  In an apparent effort to support his request, Plaintiff also provided documents, which were three doctors' notes dated January 23, 2003, September 21, 2010, and May 02, 2019.  Doc. [71-33]; Doc. [71-34].  The 2003 note stated that Plaintiff had ADHD and requested that he have "no time limitations" on "testing."   Doc. [71-33] at 4.  The 2010 note stated that Plaintiff had a diagnosis of ADHD and a learning disorder.  *Id.* at 3.  It noted his prognosis was "good" and made no mention of any accommodations.  *Id.*  The 2019 note said only that Plaintiff had a "medical schedule A disability."  Doc. [71-34] at 2.  It provided no specifics and recommended no accommodations.  *Id.*

Heather Brown, who worked in Employee Services, the department that spearheads accommodations requests for Defendant, responded to Plaintiff that Defendant required medical documentation within one year of an accommodation request and that the documentation should support "the specific accommodations being requested."  Doc. [71-32] at 1.  But even noting that deficiency, Brown still sought to "move forward with th[e] interactive process" by asking Plaintiff several questions on how Defendant could best accommodate Plaintiff.  *Id.* at 2.  For example, on Plaintiff's vague request for "helpful reminders," Brown asked how frequently he would like reminders.  *Id.*  She asked whether Outlook reminders might be helpful to him and asked if he had any other tools in mind that would assist him with reminders.  *Id.*

- 29 -

Eventually, Plaintiff provided Defendant a doctor's note[16] dated October 21, 2020, that cited Plaintiff's ADHD and his "well documented history of a learning disorder."  Doc. [71-35]. It stated Plaintiff would require "accommodations/academic adjustments in a learning environment," specifically, he needed "out of class testing and double time on exams."  *Id.* Plaintiff resigned his employment on October 27, 2020, less than one week after he provided the only timely doctor's note to Defendant.  Doc. [71-28] at 1.

The Court struggles to understand the basis of Plaintiff's failure to accommodate claim based on his attention-deficit hyperactivity disorder and his learning and reading disorder. Plaintiff's first mention to anyone with Defendant of these conditions stated he only "want[ed] [his] managers to be informed of [his] disability." Doc. [71-29].  He added that, "[b]eyond that, [he] d[id]n't feel that [he] need[ed] any further accommodations to excel in [his] new position." *Id.*  In his first formal request for accommodations, Plaintiff specifically told Defendant that he was *not* requesting accommodations related to these conditions at all.  When he finally made a request for accommodations related to these conditions, he did *not* provide timely medical documentation to substantiate the disabilities he claimed.  Plaintiff does not argue that Defendant violated the ADA through its policy of requiring medical documentation; nor would such an argument likely be successful.  *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) (Magill, J., for the Court) (noting an employer "need not take the employee's word for it that the employee has an illness that may require special accommodation"); *cf. Lipp*, 911 F.3d at 546 n.9 (requiring medical verification after unplanned leave—consistent with company policy—was "not unreasonable").  By the time Plaintiff provided the documentation, he resigned less than one week later.

---

[16] This letter, along with the three others mentioned above, were the only doctors' notes Plaintiff ever submitted to Defendant regarding "his requested accommodations" during the entire tenure of his employment.  Doc. [83] ¶ 75.

Even if the Court overlooks the issue of Plaintiff's lacking medical documentation, Plaintiff did *not* identify a single instance of an accommodation related to "learning" or "testing" that Defendant denied him.  Plaintiff's only timely doctor's note stated that Plaintiff would require "accommodations/academic adjustments in a learning environment," specifically, "out of class testing and double time on exams."  Doc. [71-35].  But the only tests Defendant required Plaintiff to take were tests Defendant gave during Plaintiff's orientation.  Doc. [83] ¶ 76.  He completed those tests without time constraints, *id.*, and long before he requested test-related accommodations.

In an effort to perhaps muddy the water, Plaintiff points out that his final written warning references his extended absence around the time he completed his Security Plus exam, which was not even required for his position with Defendant.  Even if the Court ignored the fact that this extended absence occurred *prior* to his September 04, 2020 request for accommodation related to his learning disability and ADHD (and after he specifically told Defendant he was *not* requesting any accommodations related to those issues), the record demonstrates that the extended nature of Plaintiff's absence was *not* related to his disability or to the test; his absence from work was more frolic than detour.

Plaintiff completed the Security Plus boot camp training on June 29, 2020, and was scheduled to take the exam on Tuesday, July 07, 2020.  Instead of taking the test on July 07, Plaintiff rescheduled the test due to, as he put it, "a ridiculous amount of personal stress going on in [his] life."  Doc. [87-1] at 43.  Despite not taking the test that week, he chose not to work at all, telling his supervisor that "it would be best for [him]" if he took "the whole week off."  Doc. [87-1] at 41; Doc. [83] ¶ 21.  Plaintiff eventually took the test through an outside vendor on Tuesday, July 14, 2020.  And though he completed the test on a Tuesday, he chose not to return

to work for the remainder of that week.  Doc. [83] ¶ 22.  Altogether, he took over fifty-five hours of *unaccrued* paid time off, though Defendant authorized him to take no more than forty hours of unaccrued paid time off to study for and complete the Security Plus exam.  *Id.* ¶¶ 24–25.  He did not work at all during the weeks of June 22, June 29, July 6, or July 13, 2020.  Doc. [83] ¶ 18.  The record, including his own words, shows that his present characterization of this instance is fictional.  His disability did not cause the extension of his absence beyond what Defendant authorized.  And, even if it did, Plaintiff appears to be under the mistaken assumption that the ADA requires an employer to provide a disabled employee with indefinite leave.  It does not.  *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) ("[A]n employer is not required to provide a disabled employee with indefinite leave.").

### ii.  Spondylolisthesis

In Plaintiff's original accommodations form, Plaintiff requested that he be given a "sit/stand desk" due to "spondylolisthesis and degenerate [sic] disk disease."  Doc. [71-30] at 8.  Plaintiff acknowledges that he provided no medical documentation for this request to Defendant.  Doc. [83] ¶ 75.  Nevertheless, Defendant informed Plaintiff that he indeed could use a sit/stand desk.   Doc. [71-4] at 96 (195:7–9).  He simply needed "to purchase [it] at [his] own expense."  *Id.*  Plaintiff also admitted that his supervisor allowed him to walk around and stretch his legs.  Doc. [83] ¶ 77.  Plaintiff's opposition brief did not even attempt to revive his claim that Defendant failed to accommodate his spondylolisthesis.

### iii.  Bilateral Lazy Eyes

Assuming Plaintiff's bilateral lazy eyes constitute a disability under the ADA, he acknowledges that he provided no medical documentation for this request to Defendant.  Doc. [83] ¶ 75.  Indeed, he never referenced any eye issues in the two accommodations requests he

submitted to Defendant.  He did, however, raise the issue with his direct supervisor, to a small degree.  Plaintiff asked "to be reassigned to a workstation where the computer monitors had greater mobility," Doc. [77] at 10, because, as he told his supervisor, he did not want to be "straining [his] eyes all day," Doc. [71-6] at 3.  Plaintiff's supervisor informed him that none of the workstations "w[ould] get [the monitors] closer than" how Plaintiff had them at his current desk.  *Id.*  She informed him, though, that it was "totally ok" for him to move the monitors as he needed and that they also could enlarge the font on the screens.  *Id.*  So, even if the Court would construe that Plaintiff's request to his supervisor to avoid straining his eyes was an accommodation request under the ADA, Plaintiff, in no way, explains why the supervisor's solution was not reasonable.

Thus, Plaintiff's claims under the ADA fail.

### C.  Retaliation

Lastly, Plaintiff's claim for retaliation.  His Complaint premises his retaliation claim on how Richardson treated him after he reported the Facebook group chat.  *See* Doc. [1-2] at 2 (alleging, under the heading "Retaliation," that after he reported Richardson's Facebook group chat, Richardson told Plaintiff he "was not allowed to talk with HR or Workplace Relations during the workday," and that he "needed to subtract that time from [his] timecard," which would "doc the time from [his] pay"); *id.* at 4 (alleging Richardson would "coun[t] the number of times [Plaintiff] got up from [his] desk and the number of minutes [he] spent in the bathroom" and that those "actions appeared to be her way of retaliating against [Plaintiff] for blowing the whistle on her Facebook chat group").  Similarly, in his opposition to Defendant's Motion for Summary Judgment, he only discusses Richardson when he discusses his retaliation claim.  *See, e.g.*, Doc. [77] at 3 (claiming Richardson "tracked" the time Plaintiff "spent in the restroom and

speaking with Human Resources"); *id.* at 12 (pointing out that Richardson "informed Plaintiff that he had not yet demonstrated that he had learned everything necessary from CVN" to progress to training for other things).

"Title VII prohibits employers from . . . retaliating against employees for opposing unlawful employment practices, making a charge, or participating in an investigation under the statute." *Kempf v. Hennepin Cnty.*, 987 F.3d 1192, 1195 (8th Cir. 2021) (citing 42 U.S.C. § 2000e-3(a)).  And just like the other claims discussed herein, Plaintiff can defeat summary judgment on his retaliation claim by producing "either direct evidence of retaliation" or by "create[ing] an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Pye*, 641 F.3d at 1020 (quoting *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011)).  "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  *Id.*  Without direct evidence, a plaintiff can establish a prima facie case of retaliation under 42 U.S.C. § 2000e–3(a), by showing that (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two.  *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021) (citing *DePriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016)).

Plaintiff's retaliation fails both approaches because he has not alleged—let alone evidentiarily supported—that he suffered an adverse employment action based on retaliation. Plaintiff acknowledges that he was able to speak to employees from Human Resources and Workplace Relations "throughout his workday on numerous occasions." Doc. [83] ¶ 89.  He also does not dispute that he notified Workplace Relations about Richardson's conduct and she

stopped it.  *Id.* ¶ 90.  He acknowledges that he "received his pay for any breaks he alleged were 'docked' from his time," *id.*; *accord* Doc. [71-4] at 120 (259:25), and that Defendant has no records reflecting that Richardson ever actually reduced Plaintiff's time or pay or records reflecting that Plaintiff was not paid for the time he worked, Doc. [83] ¶ 91.  Having shown no adverse employment action whatsoever, his retaliation claim fails.

C<small>ONCLUSION</small>

For these reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Doc. [70], is **GRANTED**.

An appropriate Judgment will accompany this Memorandum and Order.

Dated this 31st day of July 2023.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

- 35 -